**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL RAILROAD PASSENGER CORP. (AMTRAK),** <br><br> Plaintiff, <br><br> v. <br><br> **3.44 ACRES MORE OR LESS OF LAND AND BUILDING located at 900 2nd Street NE, Washington, DC 20002-3557, et al.,** <br><br> Defendants. | Case No. 15-cv-01088 (CRC) |

**MEMORANDUM OPINION**

The National Railroad Passenger Corporation, known by all as "Amtrak," can take "interests in property" by eminent domain where those interests are "necessary for intercity rail passenger transportation." 49 U.S.C. § 24311(a)(1)(A). Relying on this authority, Amtrak filed suit in July 2015 to condemn two parcels of land owned by Defendant Fluorine LLC that sit adjacent to Washington Union Station.

Fluorine has filed a motion for partial summary judgment challenging Amtrak's statutory authority to take one of the parcels, which contains an office building and an underground parking garage. It reads the statute governing Amtrak's acquisitions narrowly as requiring absolute, last-resort necessity, and it contends that the parcel is not indispensable to Amtrak's operations. Amtrak responds in a cross-motion that the condemnation is amply justified under § 24311 because Amtrak has reasonably deemed the property necessary to further its goals. For the reasons that follow, the Court will grant Amtrak's motion and deny Fluorine's.

## I. Background

Washington's iconic Union Station is Amtrak's headquarters and one of its busiest rail stations. Since 2012, defendant Fluorine LLC has owned two adjacent parcels of land just north of Union Station. The parcels hug the west side of 2nd Street Northeast and abut the east side of the railroad tracks that head north out of Union Station. The first parcel, Lot 814, contains a surface parking lot with an electrical substation beneath it. The other, Lot 812, contains an office building called the Railway Express Agency Building ("REA Building") and an underground parking garage. Together, the lots comprise nearly 110,000 square feet.

Historically, Amtrak leased office space in the REA Building and had additional access to it through various easements. At the time Amtrak condemned the lots, it was the building's largest tenant—it leased almost 35,000 square feet, or 30% of its leasable space. Amtrak also controlled an underpass below Union Station that extends under the H Street Bridge and connects with the parking garage beneath the REA building. It previously granted Fluorine's predecessor an easement to use that underpass for vehicle access and parking.

As part of its efforts to develop the Northeast Corridor railway line from Boston to Washington, D.C., Amtrak in 2012 began devising a plan to rehabilitate and expand Union Station. Pl.'s Mot. Summ. J. Ex. 22, at 11:6–12:1. The result was an omnibus "Union Station Master Plan," which contemplated Amtrak's "reconstruction of all tracks [and] platforms, creating a series of new concourses below the tracks," and overall sought to "provide safer, more efficient, more accessible services for passengers and for employees." Id. Ex. 23, at 17:1–13.

Over the next three years, Amtrak studied how best to expand the station's capacity and, as part of this process, commissioned a report assessing the possible acquisition of the two parcels at issue. Id. at 31:15–34:8. That 2012 report considered the operational and financial

2

consequences of the possible purchase, and in the end recommended acquisition. Id. at 33:16–22; see also Def.'s Mot. Summ. J. Ex. D (sealed report).

In January 2015, after further study, Amtrak personnel created a presentation for its Board of Directors proposing Amtrak's acquisition of the REA Building, as well as the adjacent parking lot and air rights above it. See Pl.'s Mot. Summ. J. Ex. 32. The proposal explained that Amtrak needed to own the parcels to address six "Strategic Issues" related to the Union Station Master Plan. Id. at 8. First, Amtrak required "access to a portion of the REA property" to construct a new, expanded railroad track. Id. at 9. Second, Amtrak sought to gain control over its "40 easements across, under and above" the parking lot and its subsurface easements running beneath the REA Building. Id. at 11. Third, once the tracks were reconfigured pursuant to the Master Plan, the REA Building would provide "the only access" for emergency vehicles to the tracks. Id. at 12. Fourth, the parking lot was "the only suitable space" for constructing improvements to the lower-level tracks. Id. at 13. Fifth, to accommodate new and future expansion, Amtrak needed to relocate several structures currently housed in the western part of Union Station's rail yard. Id. Finally, the presentation identified a need for "emergency pedestrian egress pathways and control of [the] H Street Underpass," through which Fluorine had an easement. Id. at 8.

In May 2015, Amtrak's Board of Directors approved a resolution authorizing Amtrak to purchase Lots 812 and 814 or, if unable to strike a deal, to condemn them by eminent domain. See Pl.'s Mot. Summ. J. Ex. 9, at 15–16. The resolution declared that Amtrak's acquisition of the building was "necessary for Amtrak's intercity rail passenger transportation" id. at 16, noting that Amtrak provided rail service "over numerous essential easements located throughout the property on which the REA Building is located," id. at 15.

3

Three weeks after the resolution passed, Amtrak sent a letter to Fluorine offering to purchase the two lots for $35 million. Pl.'s Mot. Summ. J. Ex. 34. Fluorine rejected the offer three days later in a one-line letter: "Thank you for your interest. Fluorine, LLC has no intent [o]n selling the property." Id. Ex. 35.

Amtrak then brought this condemnation action in July 2015. As required by 49 U.S.C. § 24311(b)(1), Amtrak filed a declaration (a) stating "the public use for which the interest is taken"; (b) describing the property; (c) stating the interest in the property; (d) "showing the interest taken"; and (e) estimating just compensation for the interest taken. See Decl. of Taking (ECF No. 3). It also deposited $35 million with the Court as an estimate of just compensation. Id. ¶ 16.

Two months after Amtrak commenced this action, the parties stipulated to Amtrak's acquisition of the property but reserved "Fluorine's right to contest the validity of Amtrak's taking." Joint Stipulation and Order 3 (ECF No. 23). Following discovery, both Amtrak and Fluorine moved for partial summary judgment on the sole question of whether Amtrak was permitted to take Lot 812, the parcel containing the REA Building and the underground parking garage. The Court held a hearing on the cross-motions on August 29, 2017.

**II. Standard of Review**

A party is entitled to summary judgment if the pleadings and other materials in the record show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[A] material fact is 'genuine' . . . if the evidence is such that a reasonable jury

4

could return a verdict for the nonmoving party" on a particular claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**III. Analysis**

**A. The Standard Governing Amtrak's Exercise of Eminent Domain**

Congress gave Amtrak the power to acquire by eminent domain "interests in property" that are "necessary for intercity passenger rail transportation," 49 U.S.C. § 24311(a)(1), and that it cannot "acquire by contract" or "agree with the owner on the purchase price," id. § 24311(a)(2).

The central issue before the Court is just how "necessary" a property interest must be to be eligible for condemnation and, relatedly, how much weight a court should give Amtrak's own determination of necessity. Fluorine contends that Amtrak's power is narrow and that courts owe Amtrak no deference on its determinations of necessity. In Fluorine's view, Amtrak may condemn a property interest only "as a last resort"—"where it cannot practicably do otherwise"—and it urges the Court to engage in a searching, fact-specific review of Amtrak's condemnation decision. Pl.'s Mem. Supporting Mot. Summ. J. 14. Moreover, Fluorine urges that, if Amtrak applies the incorrect standard of necessity in its internal deliberations, a reviewing court must invalidate the taking. For its part, Amtrak argues that § 24311's term "necessary" denotes usefulness, appropriateness, or convenience—not absolute, last-resort necessity. And it submits that courts have "a limited scope of review" over Amtrak's condemnations—akin to the abuse of discretion standard that applies to judicial review of agency decisions. Def.'s Mem. Supporting Mot. Summ. J. 9.

The Court finds that Amtrak's power—and the scope of the Court's review—lies somewhere between these two extremes.

5

First, courts simply do not owe Amtrak's determinations of necessity the same sort of substantive deference that federal agencies and other government entities receive when condemning property. The Supreme Court has distinguished between two types of statutes delegating the power of eminent domain. On one hand, there are "general authorization[s]" that "authorize officials to exercise the sovereign's power of eminent domain on behalf of the sovereign itself." United States v. Carmack, 329 U.S. 230, 243 n.13 (1946). Condemnations made under those sorts of authorizations are subject to minimal judicial review. See id. On the other hand, the Court has explained, there are

> statutes which grant to others, such as public utilities, a right to exercise the power of eminent domain on behalf of themselves. These are, in their very nature, grants of limited powers. They do not include sovereign powers greater than those expressed or necessarily implied, especially against others exercising equal or greater public powers.

Id. Because Amtrak is a government-sponsored corporation and not a government entity, see 49 U.S.C. § 24301(a), its eminent domain statute falls within this latter category. See Nat'l R.R. Passenger Corp. v. Two Parcels of Land, 822 F.2d 1261, 1264–65 (2d Cir. 1987). Amtrak's power to take property is thus confined to the terms of its statutory grant.[1]

---

[1] At oral argument, counsel for Amtrak suggested that it should be treated like a government actor when it takes property. This argument must be rejected. True, the Supreme Court has held that Amtrak should be treated as a government actor for certain constitutional purposes, including "for the purpose of individual rights guaranteed against the Government," Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 394 (1995), and in evaluating separation-of-powers challenges to its authority, Dep't of Transp. v. Assoc. of Am. R.R.s, 135 S. Ct. 1225, 1233 (2015). But these cases show that Amtrak's governmental status depends on the context of its action—and specifically on whether Congress's express statement that Amtrak is not a federal actor carries the day. And, as the Court explained, Congress's disclaimer of Amtrak's governmental status "is assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control." Lebron, 513 U.S. at 392; see also United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 492 (D.C. Cir. 2004) (holding that Amtrak is not "the Government" for purposes of the False Claims Act because the Act's scope is "a matter 'within Congress's control'"). Unlike with individual constitutional rights and interbranch conflict, Congress has plenary control over the scope of its delegations of eminent

So what are the terms of that grant? Again, § 24311 allows for the condemnation of "interests in property" that are "necessary for intercity passenger rail transportation." One aspect of this standard is clear—Amtrak must show that the *property* it seeks to acquire is "necessary for intercity passenger rail transportation," not that condemnation is the necessary *means* of acquiring that property. The history of § 24311 and its predecessor statute shows that this is so. Congress first gave Amtrak the power of eminent domain in 1973, and the original version of its grant allowed Amtrak "to acquire *any right-of-way, land, or other property* . . . which is required for the construction of tracks or other facilities necessary to provide intercity rail passenger service, by the exercise of the right of eminent domain." Pub. L. No. 93-146, § 6, 87 Stat. 548, 549 (1973) (emphasis added). This language was revised in 1994 as part of an omnibus bill "to restate in comprehensive form, *without substantive change*, . . . laws related to transportation." H.R. Rep. No. 101-868, at 1 (emphasis added). Specifically, the House committee report shows that the 1973 law's text preceding "interests in property"—"right-of-way, land, or other"—were "omitted as surplus" in the new version. Id. at 104. So, as relevant here, the modern statute's term "interests in property" refers to the *parcel* that Amtrak seeks to take—the parcel must be "necessary for intercity passenger rail transportation." It is not, as Fluorine contended at oral argument, a subtle way for Congress to indicate that *fee simple ownership*, as opposed to a lease or easement, must be "necessary."

This conclusion, combined with Amtrak's status as a for-profit corporation, has one further consequence. Where Amtrak's condemnation is challenged, the Court may uphold the

---

domain power. So while Lebron may imply that Amtrak has an *obligation*, under the Fifth Amendment, to provide just compensation any time it takes property, it certainly does not imply that Amtrak gets the *benefit* of governmental status when it takes property pursuant to a limited statutory delegation.

7

taking if it finds that the property taken is necessary for intercity passenger rail transportation. Just as Amtrak's interpretation of § 24311 and its determinations of necessity do not warrant substantial judicial deference, neither do flaws in its internal decisionmaking process warrant halting a condemnation. Cf. SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Thus, contrary to Fluorine's argument, any disagreement the Court may have with Amtrak's proffered statutory interpretation does not *alone* demand that Fluorine prevail.

That leaves the question of what it means for property to be "necessary for intercity passenger rail transportation." Fluorine urges a more restrictive definition of necessity—one of absolute, last-resort need. Its interpretation finds some support in dictionaries. See, e.g., Webster's Second New International Dictionary 1635 ("Essential to a desirable or projected end or condition; not to be dispensed with without loss . . . ."). And it applies in some other legal contexts—for example, the "three elements necessary to meet standing requirements." Black's Law Dictionary (10th ed. 2014).

But for centuries the law has also recognized a broader understanding of necessity that does not imply indispensability. Chief Justice Marshall famously concluded that, for constitutional purposes, "necessary" laws are those "'convenient, or useful' or 'conducive'" to implementing one of Article I's enumerated powers. United States v. Comstock, 560 U.S. 126, 133–34 (2010) (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 413–14 (1819)). The Supreme Court has similarly interpreted the tax law's reference to "necessary" business expenses as covering those that are those "appropriate and helpful" to a business. Commissioner v. Heininger, 320 U.S. 467, 471 (1943). And, in a context closer to home, some states require that

a government taking be "necessary" to achieve some public purpose, yet interpret this limitation as requiring "only that the taking be reasonably necessary to the accomplishment of the end in view under the particular circumstances." Cersosimo v. Town of Townshend, 431 A.2d 496, 498 (Vt. 1981) ("It does not mean an imperative, indispensable or absolute necessity . . . .").

Recognizing the indeterminacy of the term "necessary," the parties rightly concede that the standard in § 24311 is ambiguous, and therefore that the Court must look beyond its plain text "to resolve that ambiguity." Robinson v. Shell Oil Co., 519 U.S. 337, 345 (1997). Statutory structure, purpose, and legislative history can shed light on the meaning of an ambiguous text.

The Court finds that § 24311's standard is best read as more stringent than mere "usefulness," but more lenient than absolute, last-resort need. For Amtrak to acquire a property interest by eminent domain, the property interest must have a "significant relationship" with Amtrak's provision of intercity rail passenger transportation. Two Parcels of Land, 822 F.2d at 1265. In other words, the taking must have some direct nexus to Amtrak's goals, which, as set forth by statute, include minimizing federal subsidies, 49 U.S.C. § 24101(c)(1)–(2), and maximizing "the use of its resources, including the most cost-effective use of employees, facilities, and real property," id. § 24101(c)(12).

All courts that have construed Amtrak's eminent domain power have adopted this broader sort of interpretation. The Second Circuit, while acknowledging that "Amtrak's exercise of its delegated power of eminent domain is entitled to less deferential review than that of a government agency," declined to impose a strict standard of necessity. Two Parcels of Land, 822 F.2d at 1265. Rather, the court was satisfied by the "significant relationship between the condemned property"—a service road that Amtrak planned to reconvey to a municipality—and Amtrak's "goals," as set forth in statute. Id. A district court in Massachusetts analyzed the

9

modern version of the statute similarly. It concluded "that 'necessary' should be construed to mean that Amtrak finds that an acquisition is a useful and appropriate way to accomplish its goals," and that courts should "review Amtrak's decision . . . to determine if it has abused its discretion by making an unreasonable business judgment that the condemnation of the property is necessary." Nat'l R.R. Passenger Corp. v. 4,945 Square Feet of Land, 1 F. Supp. 2d 79, 82 (D. Mass. 1998).

And while the Supreme Court has not interpreted the specific language of § 24311, in National R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407 (1992), it confronted a similar provision allowing Amtrak to condemn railroad property upon approval of the Interstate Commerce Commission ("ICC"). The ICC had effectively interpreted that provision's standard—that the property be "required for intercity rail passenger service"—as meaning that the property must be "useful or appropriate" to Amtrak's goal of providing service. Id. at 418. In upholding Amtrak's taking, the Supreme Court found the statute ambiguous and gave deference to the ICC's interpretation, explaining that "in the context of this statute it is plausible, if not preferable, to say that Amtrak can find that an acquisition is required when it is a useful and appropriate way to accomplish its goals." Id. at 419. It accordingly rejected the D.C. Circuit's conclusion that the statute unambiguously required that the property be "indispensable" to Amtrak's goals. Id. at 419.

As Fluorine observes, Boston & Maine does not directly answer the question before this Court because Amtrak, unlike the ICC in that case, is not entitled to deference in its interpretation of the eminent domain statute. But the Supreme Court's conclusion that the prior statute's term "required" is ambiguous applies with equal force here, and surely its suggestion that the ICC's reading is the "preferable" one is at least persuasive.

10

Fluorine's second argument on this front is more substantial. Section 24311, like its predecessor statute at issue in Boston & Maine, distinguishes between takings of railroad and non-railroad property. When Amtrak takes property owned by entities other than railroads, it files its condemnation action directly in court and the taking is governed by the standard in § 24311(a)(1)(A)—the standard at issue here. A different procedure, however, governs takings of railroad property: Amtrak must apply to the Surface Transportation Board (in the prior version of the statute, the ICC) for an order establishing Amtrak's need for the property and ordering its conveyance on reasonable terms. 49 U.S.C. § 24311(c)(1). Amtrak's need "is deemed to be established," and the Board "shall order the interest conveyed unless [it] decides that" the rail carrier would be significantly burdened and Amtrak could adequately meet its transportation obligations through alternative means. Id.

Fluorine contends that, by codifying a presumption of need only for railroad property, Congress implied that Amtrak must prove genuine need when condemning non-railroad property. That argument is only half correct. The absence of an evidentiary presumption does mean that Amtrak must affirmatively show necessity when it condemns non-railroad property. But the absence of a presumption does *not* imply that Amtrak's standard of necessity is strict. If anything, the link between the provisions governing railroad and non-railroad takings cuts in the other direction: The "back-to-back" juxtaposition of the provisions—both requiring that the property taken be "necessary for intercity passenger rail transportation"—demands that the *substance* the necessity standard is the same for both types of property. 4,945 Square Feet of Land, 1 F. Supp. 2d at 82. And, again, in the railroad context, the Supreme Court has suggested that a broader reading of necessity is "preferable." Boston & Maine, 503 U.S. at 419.

11

Uses of the word "necessary" elsewhere in Amtrak's governing statute provide further support for a broader interpretation of the term in the eminent domain provision. See Envt'l Defense v. Duke Energy Corp., 549 U.S. 561, 2007 (citing "presumption that the same words repeated in different parts of the same statute have the same meaning"). The section laying out Amtrak's general authority provides that "Amtrak may acquire, operate, maintain, and make contracts for the operation and maintenance of equipment and facilities *necessary* for intercity and commuter rail passenger transportation, the transportation of mail and express, and auto-ferry transportation." 49 U.S.C. § 24305 (emphasis added). Congress unlikely wanted Amtrak to conduct daily audits of its equipment to ensure that every piece was truly indispensable to its operations—it seems to have presumed that Amtrak would exercise reasonable judgment in acquiring, operating, and maintaining equipment to further its goals.

Moreover, while Fluorine claims that § 24311's legislative history reveals Congress's intent to define necessity narrowly, the committee report on which it relies is at best indeterminate. Amtrak was first given the power of eminent domain as part of the Amtrak Improvement Act of 1973, Pub. L. No. 93-146, 87 Stat. 548. That statute allowed for acquisitions of any property interest "required for the construction of tracks or other facilities necessary to provide intercity rail passenger service." Id. § 6, 87 Stat. at 549. Fluorine latches onto language from the committee report accompanying the 1973 law, which explains that the committee intended Amtrak's right "to be restricted, in the sense that Amtrak should utilize the power prudently and judiciously—as a last resort method, and only when absolutely necessary to fulfill its needs to provide intercity passenger service." H.R. Rep. No. 93-415, at 8.

Read in context of the entire report, the statement that Amtrak should use its power carefully is better understood as an admonition than a judicially enforceable limit. The

committee goes on to describe two safeguards against Amtrak's abuse of its eminent domain power, neither of which suggests a legal standard of indispensability. First, "[t]he judicial review which is exercised through the condemnation proceedings assures that the property being taken is in fact needed for the purpose mandated under the statute"—an emphasis on reviewing the propriety of Amtrak's purpose, not the direness of its need for the property. Id. at 9. And, second, "this power will not be abused because of Amtrak's limited budgets, and the fact that Congress and the [ICC] annually review [Amtrak's] activities." Id. Congress's contemplation of these softer checks on Amtrak's eminent domain power presupposes that Amtrak *has* discretion that must be checked.

The report also explains that the committee saw Amtrak's new power of eminent domain as "similar to that accorded railroads and public utilities under State law." Id. at 8. Many states have granted railroads the power to condemn property when, for example, it was "necessary for the construction, maintenance or operation of such [rail]road, or the necessary sidings, side-tracks or appurtenances." Aurora & G. Ry. Co. v. Harvey, 53 N.E. 331, 332 (Ill. 1899). Courts have generally interpreted the standard of necessity in these sorts of statutes broadly to mean 'expedient,' 'reasonably convenient,' or 'useful to the public,' and [not] limited to an absolute physical necessity." Id. at 334; see also, e.g., N. States Power Co. v. Oslund, 51 N.W.2d 808, 809 (Minn. 1952) (for taking by public utility, "there need be no showing of absolute or indispensable necessity, but only that the proposed taking is *reasonably necessary* or *convenient* for the furtherance of the end in view").

The historical takings power of railroads and utilities, however, was not boundless. Interpreting a statute granting rail carriers the power to "appropriate such land 'as may be

13

deemed necessary for its railroad,'" one state supreme court provided a helpful summary of the relevant limitations:

> Necessary land here must be held such as is reasonably proper, suitable, and useful for the purpose sought. Some discretion must be allowed the railroad in determining the needs of itself and the public. In limiting the power of appropriation to that which is necessary, it is manifest that it was the legislative purpose to prevent the abuse of the power by making appropriations for speculative, monopolistic, or other purposes, foreign to the legitimate objects contemplated by the corporation charter.

Eckart v. Ft. Wayne & N.I. Traction Co., 104 N.E. 762, 764 (Ind. 1914) (citations omitted). The committee's analogy to railroads and public utilities suggests that it saw Amtrak's power as confined to property that would directly further Amtrak's transportation goals—mere profit motive would not do—but that it did not expect the imposition of strict, last-resort necessity.

All in all, this standard of necessity—one that implies a significant link between the property and the "legitimate objects" set forth in Amtrak's statutory charter—is the one contemplated by § 24311 and best effectuates its purpose. A strict standard of last-resort need would be impossible to implement without vitiating Amtrak's power to take property: it is hard to imagine a property truly indispensable to Amtrak's ability to provide rail service. But general "usefulness" is similarly problematic. Almost any condemnation could be plausibly justified as useful for a transportation provider: Taking a commercial building with no physical connection to Amtrak's rail system and selling it for a profit might enable Amtrak to lower its ticket prices. Rather, just as Congress unlikely wanted to confer a functionally inert takings power, neither would it sensibly include restrictive language along the axes of purpose ("intercity passenger rail transportation") and importance ("necessary") if it expected those restrictions to be completely toothless. The upshot is that Amtrak may condemn property only if it has a significant connection to its goal of providing intercity passenger rail transportation. The sufficiency of this

connection is a question of fact, but one readily resolvable on summary judgment. See Two
Parcels of Land, 822 F.2d at 1262; 4,945 Square Feet of Land, 1 F. Supp. 2d at 80.

### B. The Record Shows that Lot 812 is "Necessary for Intercity Passenger Rail Transportation"

Having decided the standard to apply, the Court now turns to whether the record evidence supports summary judgment for either party. Fluorine contends that, even under a broader understanding of necessity, Amtrak has not shown that taking Lot 812 was necessary for intercity passenger rail transportation. At a minimum, it argues, there remain material disputes of fact regarding necessity.

Again, the relevant question is whether the parcel containing the REA Building and its underground garage has a significant relationship with Amtrak's goal of providing intercity passenger rail transportation. The Court finds that, as a matter of law, Amtrak has satisfied that standard.

It is undisputed that, before the taking, Amtrak used the REA Building for its intercity passenger rail transportation operations: Amtrak leased about 30% of the offices in the REA Building to house staff from several departments and had easements for use of space in the building below its tracks at Union Station. Def.'s Mem. Supporting Mot. Summ. J. 4.

It is also undisputed that Amtrak sought to condemn the property in order (1) to allow for expanded use of the property in the future and (2) to secure its existing uses of the building and underpass through fee simple ownership. And, on both of these fronts, Amtrak's past and planned uses for the property bear an indisputable link with its transportation goals. When it comes to its operations, Amtrak believes that the simplest way to expand the eastern side of the railyard would be to demolish approximately 1,000 square feet of the eastern side of the REA Building. See Pl.'s Mot. Summ. J. Ex. 23, at 63–66 (Deposition of Gretchen Kostura, Amtrak's

15

Infrastructure Planning Manager). Even if this demolition is not the *only* solution for track expansion, see id. at 64, ownership of the building provides Amtrak with flexibility in deciding how to most efficiently execute this aspect of the Union Station Master Plan.

Moreover, Amtrak has an interest—and one within the scope of § 24311—in solidifying its current interests in the REA Building through fee simple ownership. In particular, it is undisputed that Amtrak viewed its easement providing access to the H Street Underpass as conflicting with Fluorine's easement, Pl.'s Mot. Summ. J. Ex. 22, at 34:6–38:16, and that Amtrak used the underpass for vehicle access to Union Station and for parking, Def.'s Mot. Summ. J. Ex. AA, at ¶ 4.

If this conflict of easements were truly a concern, Fluorine asks, then why could Amtrak not seek to clarify the inferiority of Fluorine's easement? For that matter, why did Amtrak not negotiate with Fluorine for a lease or easement for the additional parts of the building to which it sought access, rather than seeking fee simple ownership of the parcel? These arguments might carry the day if the Court imposed Fluorine's desired definition of necessity: one that demanded scrutinizing Amtrak's decisionmaking process to ensure that eminent domain was used as a last resort. But, again, § 24311 requires that the *property* have a significant connection with Amtrak's transportation mission. Assuming the requisite connection, the Court is not in a position to assess whether a lease, an easement, or fee simple ownership is the optimal way to further that mission. Indeed, the legislative history of Amtrak's eminent domain provision expressly contemplates, as a legitimate justification for using eminent domain, the inferiority of leaseholds to outright ownership: "Amtrak is currently leasing terminal and other facilities from various railroads. These facilities are not always best adapted to Amtrak needs, *nor is the lease always the most economical means by which Amtrak could fulfill its requirements for a facility*."

H.R. Rep. No. 93-415, at 8 (emphasis added). That was precisely Amtrak's conclusion here—it expressed concern that its current property interests in the building, consisting of leaseholds and easements, were insufficiently secure and would not afford Amtrak the necessary flexibility as it continued to expand Union Station. And Fluorine's admitted willingness to provide a property interest *less* than fee simple ownership does not undermine the soundness of Amtrak's conclusion or its compliance with § 24311.

Fluorine's other attacks on the necessity of Amtrak's condemnation must similarly be rejected. Citing the Amtrak Board's identification of a high estimated rate of return for the REA Building, Fluorine contends that Amtrak had ulterior motives for the acquisition. This fact would be troubling if profit were the *only* evident purpose for Amtrak's acquisition. But, as explained, the REA Building has a clear nexus with Amtrak's transportation-related goals, and the mere consideration of economic factors cannot defeat an otherwise valid taking. Amtrak's takings power is restricted by the terms § 24311, but so long as it does not exceed its statutory power, Amtrak is not *forbidden* from considering additional factors before seeking to acquire a multi-million-dollar property.

Finally, Fluorine contends that Amtrak "failed to consider an important aspect of the problem before it" by not separately analyzing the need to acquire the REA Building, apart from its need to acquire the adjacent surface parking lot. Def.'s Opp'n 30. The Court, however, is not conducting arbitrariness review: the question is not whether Amtrak's decisionmaking *process* was perfect, it was whether it reached an *outcome* that is permissible under the statute. And, as explained above, the connection between the REA Building and Amtrak's transportation mission is evident from undisputed facts in the record.

## IV. Conclusion

Because the Court finds that, as a matter of undisputed fact, the condemned parcels were necessary for intercity passenger rail transportation, the Court will grant Amtrak's motion for partial summary judgment and deny Fluorine's cross-motion. The amount of just compensation due to Fluorine will be determined as necessary in a subsequent proceeding. A separate Order accompanies this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: September 20, 2017